AMOS WOODRUFF ET AL. *v.* THE STATE OF MISSISSIPPI ET AL.

1. DEBTS, HOW PAYABLE. *Payment in gold coin.*

    All debts made payable in dollars, are payable in legal tender treasury notes, but an obligation payable "in gold coin," can be discharged only according to its terms.

2. CORPORATE POWER. *Levee board, district No. 1. Bonds payable in gold coin, ultra vires.*

    Under the act creating the levee board of the state of Mississippi, district no. 1, approved March 17, 1871 (Acts 1871, p. 37), and authorizing the said board to issue bonds, it had no authority to issue bonds payable "in gold coin," and its action in issuing such bonds was *ultra vires.*

3. SAME. *Same. Void ab initio.*

    The bonds of the said board thus issued and payable "in gold coin," are absolutely void.

APPEAL from the chancery court of Hinds county, first district. HON. WARREN COWAN, Chancellor.

The complainants in this bill, Amos Woodruff, trustee, the German Bank, of Memphis, Tenn., and B. Richmond, are owners and holders of a large number of bonds issued by the levee board

of the state of Mississippi, district no. 1. The bonds were issued and negotiated by the said board under the act entitled "An Act to redeem and protect from overflow from the river Mississippi certain bottom lands herein described," approved March 17, 1871. (See Acts of 1871, p. 37.)

The language of the statute authorizing the issuance of the bonds is as follows :

Section 9. "Be it further enacted, that for the purposes aforesaid, and to enable them to carry out the purposes of this act, the said board of levee commissioners shall have power to borrow money, and to that end may issue the bonds of said board to the amount of one million of dollars, in such sums and denominations, not less than one hundred dollars each, as the said board may prescribe ; which bonds shall be signed by the president and countersigned by the treasurer of said board, and be made payable to order. or bearer, in not less than two nor more than ten years after the first day of January, 1871, and shall bear a rate of interest not exceeding eight per cent. per annum, for which interest coupons may be attached, payable at such time and place as the board may contract. Said bonds shall be negotiated as promissory notes or bills of exchange, and may be sold and negotiated in any market in or out of the state, on the best terms that can be obtained for the same ; but in no case shall any of them be negotiated or sold at a greater discount than ten per cent."

By the said act a special tax is levied upon all the lands in said district protected by the levees to be built by the board, and provision is made for its collection.

By section 10 of the act it is provided "that the charges and assessments, fixed, levied, and made as aforesaid, by this act, shall be, as they are from time to time collected, and they are hereby constituted a special fund and trust, to be used by said board ; first, in the payment of any bonds that may be sold or used as before provided under this act, and of money that may be borrowed under its provisions ; secondly, for the payment of any other debts or liabilities of said board, and when collected the same shall be paid into the treasury of said board for the purposes aforesaid."

Under this statute the board of levee commissioners was organized, and issued a large number of bonds, aggregating in amount six hundred thousand dollars and payable to bearer. The bonds recited the act under which they were issued, and expressly stipulated that the interest coupons attached were payable in the currency of the United States but the principal of the bonds was payable in gold coin.

This bill is exhibited by complainants as owners and holders of a large number of bonds thus issued and negotiated. It alleges that the act of the legislature referred to imposed a specific tax *in rem* on each acre of land (with few exceptions) lying in said levee district no. 1, in order to pay said bonds and coupons; that a large amount of the lands were sold under the act for the delinquent taxes in the year 1872 and the succeeding years until 1876, and in default of buyers were struck off to the treasurer of the levee board and duly conveyed to him as such. From 1876 to 1883 there were no sales to the said treasurer, but all lands sold as delinquent were struck of for the state, county, and district no. 1 levee taxes to the state of Mississippi, and conveyed to it by one deed. The state of Mississippi in 1876 abolished the levee board of district no. 1 as constituted and made the state auditor and treasurer *ex-officio* levee commissioners its successors, and vested the titles of all lands held by the said levee board in them, to be administered by them. The bill alleges further that all such lands were held by the state *in trust* for the said bondholders under the act of March 17, 1871. The lands so held have been sold by the auditor without exacting from the purchasers the taxes due to the said levee board of district no. 1 for the years from 1871 to 1873 inclusive, but the auditor, acting or claiming to act, under certain acts of the legislature, "abated" them. This abatement was allowed by the auditor under the act of the legislature approved March 14, 1884, authorizing the auditor to make deeds to said lands to certain purchasers upon the payment of certain taxes therein specified. (See Acts 1884, p. 182.) The bill asks that the trustees, who administered the trust and who have not yet accounted, should be required to discover the, *status* of the trust estate and how it was

administered by them, and that upon such discovery relief be granted by enforcing the trust; that the sales and conveyances made by the trustees in violation of the trust, be declared void, and that such purchasers be held to an account of the trust estate so far as it has come into their hands, and that the lands be subjected to the tax chargeable against them under the said act of 1871, and the tax be held as a special fund to pay the bonds held by these complainants and others. The trustees who last administered the trust, viz.: the auditor and state treasurer, are made parties, and also the L., N. O. & T. Ry. Co., the Delta Pine Land Company, and Swan & Burroughs, all of whom are owners of large bodies of such lands, under purchase from the state.

The bill sets out minutely all the several acts of the legislature passed in reference to the said lands providing for their assessment, the abatement of taxes thereon, the manner in which the title of the levee board and of the state should be conveyed. It also sets out the character of conveyances under which the defendants, who are purchasers, hold. But, inasmuch as the opinion of the court is limited to the one question of the validity of the bonds upon their face, it is not deemed necessary to set out in detail the allegations and prayer of the very voluminous bill.

The defendants demurred to the bill, among other reasons assigned, upon the ground that the act of the levee board in making the bonds payable "in gold coin" was *ultra vires,* and the bonds therefore invalid.

The demurrer was sustained, and the complainants appeal.

*Calhoon & Green,* for appellants.

Are the bonds held by complainants void because payable in "dollars in gold coin of the United States of America"? The coupons are payable in "currency of the United States." Is such a bond *ultra vires* the levee commissioners? There is no limitation on their powers in regard to the kind of money they shall borrow, nor the kind of money the bonds shall be payable in. See § 9, act 1871, p. 43.

The argument against the power to make the bonds payable in gold coin is by implication, from the money market at the time,

and in the restriction in their sale at not less than ten per cent. discount. Both these arguments are legally unsound. The court cannot consider the state of the money market to determine the existence or non-existence of the power to execute a certain instrument claimed to be authorized by the statute. Sedgwick Stat. & Const. 241.

If the bond is in contravention of the power given, then it would be unauthorized, but if there is the authority given to issue bonds in " dollars," and no particular " dollars " are specified, then it would mean the standard of value in the United States, which is gold coin. If the money market is to be considered, then the bonds would now be unobjectionable, for gold and paper are of the same value, which demonstrates the unsoundness of this rule of construction.

But are the bonds invalid? A note payable in " currency " or " money " must be paid in money or coin at its standard value. If payable in " currency " and the standard of value changes before maturity, an amount should be paid equivalent to the value of currency at the time of drawing the note. Randolph on Com. Paper, § 1398. The " Legal Tender Act " did not change the rule that contracts, payable in gold, should be so paid. Ib. 462. Where a contract was made within the Confederacy, payable in " dollars," the supreme court of the United States held that parol evidence was admissible to show that " dollars " meant Confederate money, and that the measure of recovery would be the then value of Confederate money, in *money or coin* of the United States. *Stewart* v. *Solomon*, 94 U. S. 436; thus showing that legally money and coin were convertible terms during the war when the premium on gold was highest. Gold coin is the standard of value in the United States, and United States bonds payable in " dollars " were held payable in *gold* only. Recall the greenback party's defeat.

Gold coin is a *legal tender*, and there is no difference made in respect to its commercial use between gold and paper in the revised statutes U. S., § 3473. In *Chrysler* v. *Renois*, 43 N. Y. 209, a draft payable in " gold dollars " was held to be a negotiable

instrument.  If so, gold was money, not a commodity.  Besides, the scheme of the act of 1871 (§ 20), was to invest the trust fund in United States bonds, which were payable in gold, and to make the bonds payable in gold was only to promise to pay the trust fund in specie over to the holder of the security.  If the bond had been payable in paper, and resumption had not taken place, and the funds had been invested in United States bonds payable in gold, then the character of the fund to be paid would have differed, and thus given rise to complications.  But when the bond is payable in gold coin, and the trust fund to pay with is gold coin, no complications can arise.  We submit that the direction not to sell at less than ten per cent. discount cannot be construed into a limitation on the power of the board to execute the bonds.  It is a minimum at which the bonds *may be sold*, and has no reference to the character of the currency in which the bonds are payable.  Besides, in the price to be obtained for the bonds, the currency in which it is payable forms a small element, the solvency of the debtor and the certainty of prompt payment being the bases of credit.

The coupons are payable in currency, and are a separate obligation from the bond.  If the bond is invalid by reason of its form, it merely evidenced the debt for the borrowed money, and it in no degree vitiates the coupons, which are payable in currency.  Hence the bonds may be invalid and the coupons valid.

We therefore submit that the court erred in holding the bonds and coupons void and dismissing the bill :

1. Because the statute authorizes the board to " borrow money," and issue bonds " for dollars," and under this they had the authority to issue bonds for " gold coin," and the coupons in currency.

2. Because, under the act the trust fund to pay bonds was a gold fund, and the trustees should make the bonds likewise.  The coupons were to be payable currently out of receipts, and hence, it was proper to make them payable in currency.

3. Because gold coin is the standard of value in the United States, and authority to make contracts payable therein is necessarily implied from the power to contract.

4. There is no *prohibition* in the act against making bonds payable in gold, which is one (really the only) kind of money, and as authority is given to make contracts payable in " dollars " (if there are two kinds), legally speaking, the board had the power to make them payable in either, and the selection was left to its discretion.

5. Because the legislature has recognized that these bonds were valid by authorizing the payment of the purchase-money and taxes thereon for a number of years, and by different acts. Acts 1876, pp. 169, 176; Acts 1884, p. 185, § 3 ; Acts 1875, p. 14 : and to purchase them. Acts 1876, p. 177, § 9.

*M. Green,* of counsel for appellants, argued the case orally.

*Yerger & Percy,* for the L., N. O. and T. Ry. Co.

In making the bonds payable in gold coin, the board exceeded its authority under the act of 1871. By said act the board was authorized to issue a million dollars of bonds, not a million dollars of bonds payable in gold coin, which coin at the time of the issuance was worth eleven per cent. premium over the currency of the United States. The power to issue such bonds was not given, nor can it be implied as being necessary to carry out the objects intended to be accomplished by said act.

Not only did the levee board exceed its authority, but it acted against the interest of the people. Statutes are always construed liberally and favorably in favor of the state and the people, who are a part thereof. When the manner in which a power is to be exercised is prescribed in the charter, that mode must be pursued ; otherwise a burden greater than that authorized by law would be imposed upon the levee district. See *Police Jury* v. *Britton,* 15 Wall. 566.

*W. G. Yerger* also argued orally.

*Nugent & McWillie,* for appellees, Swan & Burroughs.

The bonds issued by the levee board were not such as the charter authorized. The board was authorized to borrow money and to issue bonds to the extent of one million dollars, no bonds to be for a less denomination than one hundred dollars. Instead of issuing the bonds for " dollars," which would have been discharged in the currency of the United States, bonds were, in fact, made payable

in gold coin of the United States.   Contracts dischargeable in gold coin were not then authorized by the act of congress, and all obligations of the government and of individuals were by express law currency obligations.   Gold coin was not then *current*, but was a *commodity purchasable at a considerable premium in the open market*.   The operative effect then of the act was to encumber the levee board with a debt for a much larger amount than that contemplated or authorized by the act of the legislature.   In view of the fact that gold was not then current, but a purchasable commodity, we think the board had no right to issue the bonds payable in gold, and the bonds are illegal and void.   The bonds recite the act of 1871 on their face and thus impart notice of their invalidity to every holder.   *Frebilcock* v. *Wilson*, 12 Wall. 687 ; *Bronson* v. *Rodes*, 7 Wall. 229.

*W. L. Nugent*, of counsel for appellees, argued the case orally.

*Frank Johnston* and *James R. Yerger*, for appellee, the Delta and Pine Land Co., of Mississippi.

The bonds issued by the commissioners of the first levee district are *ultra vires*, and therefore void.   They were required to be issued payable in dollars generally, which meant legal currency, and they were in fact made payable in gold coin.   It is true that the statute does not provide in express terms that the bonds should be payable in paper currency, but the clear and obvious construction is, that they should be so payable.   For, if the bonds had been made payable on their face in lawful money, or in legal tender, or in dollars generally, they could have been discharged in U. S. treasury notes, which were then, and are now, legal tender.

The proposition may be thus stated : That under a statutory power to issue bonds, payable in currency, the commissioners attempted to bind the district to the payment of gold coin, then at a high premium.

The sole and exclusive power to issue the bonds comes out of the special provisions of the statute, and it affords a perfect illustration of the case of a special and limited statutory power.

The validity of the execution of the power, and consequently the question of the legality of the bonds, can only be considered and

tested as of the time of the action of the board and the time of the issuance of the bonds, and not by the force of any subsequent events. In other words, the bonds at the time of their issuance were either valid or illegal, and the fact, that many years after their issuance, the paper currency of the government rose to an equality of value with gold coin can by no legal possibility affect the question. The statement of such a proposition is a solecism. It amounts to this, that the bonds when issued were to be valid in the event that currency and gold became equal in value, and to be void if paper money remained at a discount. At what time was the test to be applied and the question of their validity to be determined?

Gold and paper money might at one time have become equal in value, and again, the treasury notes might have fallen to a discount. Such are some of the remarkable considerations involved in the complainant's proposition, concluding with the *reductio ad absurdum* that whenever paper dollars were at par with gold the bonds were valid, and when at a discount the bonds were invalid. The court will judically notice the history of the national finances, and especially the resumption act of congress, the sole purpose of which was to remedy the depreciation of the U. S. treasury notes and make provision for their redemption. Not that the treasury notes were to be, or have been redeemed, but by providing for their redemption the legislative scheme was to bring their market value to par with gold. The fundamental assumption of the act of congress was, that the notes were at a discount.` It is clear that the court will judically observe the existence of these facts.

The answer, that the proceeds of the bonds derived from their sale were to be invested in U. S. government bonds is entirely without force.

The kind of money which the *holders* of the bonds were to receive, and could legally demand from the district, is clearly prescribed, and this constitutes the sole inquiry in the case, while the mode of investing the funds of the board was an entirely distinct matter.

There is no direct provision that the proceeds of the sale of these bonds should be invested in U. S. bonds, but § 5 of the

statute, Acts 1871, p. 53, provides that the funds of the board should be kept invested in the securities of the United States when not required to pay the bonds and other obligations of the board.

The funds of the board consisted, not only of the proceeds of these bonds, but of all the annual taxes provided for in the statute. Out of this whole fund, the cost of building the levees was to be provided. The bonds were to be paid and the surplus was to be invested in government securities. All of the proceeds of these bonds would not have been invested in the sinking fund securities. The taxes provided for, were manifestly to be collected in currency, and the whole idea was, that a general surplus of the general fund should not lie idle in the hands of the commissioners.

As a matter of course, the bonds were to be placed immediately on the market, and the proceeds of their sale were at the outset, necessarily, the first funds that could be utilized for the expense of levee construction. Therefore, in no possible event could more than a part of the proceeds of the bonds have been invested in a sinking fund, and we will add that only a small part, if any, could possibly have been so invested. It was the annual taxes provided for which would naturally have constituted the funds for investment in the government securities.

But again, this attempted answer of the complainant's counsel is based on the idea that the proceeds of the bonds and tax money were to be invested in government securities payable in gold. In other words, they erroneously assume that all the U. S. bonds were payable in gold, whereas, many of them were currency bonds, payable in currency by express terms, and others were payable in coin and technically and legally payable both in gold and silver coin.

The commissioners, under the statute of 1871, had the general power to invest in U. S. government bonds with the discretionary power of selecting the particular class of securities for the investment.

It is not necessary to discuss, or consider, on authority, this question of *ultra vires*. The general principle *a priori* that all special and delegated powers must be strictly complied with, can

be applied conclusively. It will be observed at once that the objection is neither refined nor technical, but practical and substantial.

The issuance of bonds, payable in *gold coin,* instead of bonds redeemable in currency, betrayed a gross ignorance or a willful and flagrant disregard of the plain directions of the statute.

Suppose a private agent, with express instructions to execute notes in the name of the principal, payable in currency, had made them payable in *gold,* then at a premium, what would have been thought of the valid execution of the power, as a legal proposition? Suppose the bonds had provided for an interest coupon payable in gold, or suppose the board had issued their obligations under this statute payable in bales of cotton or any other commodity.

In 1871, the difference in value between gold and paper dollars was variable, and as the board could only collect its taxes in currency, it placed the taxpayers of the district at the continual hazard of the enhancement of the value of gold. Its assets, consisting exclusively of currency, would constantly be required to be converted at a loss into the higher priced gold coin. The board had no more power to make this special contract for the payment of gold coin than it had to issue twenty year bonds.

There is no difference in principle between the cases. The period of time within which the bond is to run is no more essential than the kind of funds it is to be paid in, or, in other words, the maximum amount for which the bonds are to be issued. Here the legislature limited the amount to one million of currency dollars, while the one million of gold coin dollars, contracted to be paid by the board, created a debt, then equal in legal tender notes to at least eleven hundred thousand dollars. Attention is called to the principle decided in *Woodruff* v. *Okolona,* 57 Miss. 806, as decisive of the case now under consideration. It was there held that the time of payment could not be disregarded, and that the holders of the bonds were bound by notice of the statute under which they were issued.

*Frank Johnston,* of counsel, also argued the case orally.

CAMPBELL, J., delivered the opinion of the court.

When " An Act to redeem and protect from overflow from the river Mississippi certain bottom lands herein described," approved March 17, 1871, was passed, and when the bonds embraced in this suit were issued, " gold coin " was not the basis of the business of the country. It was money, but of much greater value than the circulating medium consisting of U. S. treasury notes and national bank notes, of which we take judicial notice, because it is part of the public history known to all the world, and therefore including us. 13 Wallace 358.

All debts payable in " dollars " generally were as now solvable in legal tenders, but an obligation payable in gold coin can be discharged only according to its terms. In authorizing the issuance of bonds for one million of dollars, and in the use of the term " money," the legislature must be supposed to have meant in the act cited that money which constituted the basis of the general business of the country and was a legal tender for the payment of debts.

Therefore, there was no authority in the act for the issuance of bonds payable " in gold coin," and they were void for want of authority for their issuance. This is matter of substance, involving a departure in a most material feature from the act authorizing bonds to be issued, and rendered them void from the beginning.

This is decisive of this case and renders unnecessary, if not improper, the consideration of any other question.

*Affirmed.*